# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                              NEWS RELEASE #050

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **18th day of October, 2017**, are as follows:

**BY GUIDRY, J.**:

2016-C -1647      RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEREK HEBERT v. SHELTER MUTUAL INSURANCE COMPANY, ET AL (Parish of Calcasieu)

After reviewing the record and the applicable law in this case, we find no reversible error in the trial court's rulings; however, we do find the award of punitive damages was excessive and resulted in a violation of the defendant's right to constitutional due process.  For the reasons expressed above, we affirm the lower court's judgment in part, amend the judgment to award $4,250,000 in punitive damages to the plaintiff, and affirm as amended.

WEIMER, J., dissents and assigns reasons.
CLARK, J., dissents and gives reasons.
CRICHTON, J., dissents and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2016-C-1647

RON WARREN, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF DEREK HEBERT

VERSUS

SHELTER MUTUAL INSURANCE COMPANY, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU

**GUIDRY, Justice**

Ron Warren, individually and on behalf of the Estate of Derek Hebert, filed a petition for damages seeking to recover for the wrongful death of his son in a recreational boating accident under general maritime law and products liability. A jury found the defendant, Teleflex, Inc. ("Teleflex"), liable under the plaintiff's failure to warn theory of the case and awarded compensatory damages of $125,000 and punitive damages of $23,000,000. The court of appeal affirmed. We granted Teleflex's writ application mainly to review whether the trial court properly granted the plaintiff a new trial and whether the award of punitive damages was excessive and resulted in a violation of the defendant's right to constitutional due process. For the reasons expressed below, we affirm the lower court's judgment in part, amend the judgment to award $4,250,000 in punitive damages to the plaintiff, and affirm as amended.

**FACTS AND PROCEDURAL HISTORY**

On May 7, 2005, Daniel Vamvoras was operating a 1998 Champion boat owned by his father, Glen Vamvoras, on navigable waters consisting of a former channel of the Calcasieu River. Derek Hebert was a passenger in the boat along with

several other young people. As the boat was on plane, that is, travelling at a sufficiently high rate of speed to cause the hull to rise out of the water, the hydraulic steering system manufactured by the defendant Teleflex suddenly failed, causing the boat to turn violently, referred to as a "J-hook," ejecting Derek and four of the other passengers from the boat. Because the kill switch had not been engaged, the boat spun around and its propeller struck Derek nineteen times, causing traumatic damage that resulted in his death. A dive team later recovered his body from the bottom of the lake.

Derek's parents filed survival and wrongful death claims against various defendants, as well as a punitive damages claim under general maritime law. Those defendants included Glen Vamvoras and his son Daniel, as well as the operator of another boat that had collided with the Vamvoras boat after the latter lost steering, various marinas, insurers, and manufacturers. Derek's mother's claims were settled after mediation and her suit dismissed. Derek's father proceeded with his wrongful death and survival actions, seeking compensatory damages, punitive damages, and judicial interest thereon.

This matter was tried twice, as explained herein. After years of litigation, the matter finally came to trial in 2014 against defendants Glen and Daniel Vamvoras and Teleflex. This trial was bifurcated as to the issues of liability and exemplary damages. At the close of the liability portion of that first trial, the district court granted the Vamvorases' motions for a directed verdict, dismissing them from the suit and leaving Teleflex as the only defendant on the verdict form. The first jury returned with a finding of no liability on the part of Teleflex; so, the trial court signed a judgment in September 2014 dismissing the plaintiff's claims. However, the trial court thereafter granted the plaintiff's motion for new trial based on what it believed to be prejudicial error during the first trial.

The second trial, which involved only Teleflex as the defendant and which was not bifurcated as to liability and exemplary damages, resulted in a jury verdict in favor of the plaintiff. The jury found liability on the part of Teleflex and awarded compensatory damages of $125,000 and exemplary damages of $23,000,000. Based on this verdict, the trial court signed a judgment in December 2014 awarding these amounts, as well as prejudgment interest on compensatory damages.[1]

Teleflex sought a JNOV or, in the alternative, a motion for new trial or a remittitur on punitive damages. The trial court denied Teleflex's post-trial motions following a hearing. Thereafter, Teleflex filed a suspensive appeal. The court of appeal, as discussed more fully below, affirmed. *Warren v. Shelter Mut. Ins. Co.*, 15-354 (La. App. 3 Cir. 6/29/16), 196 So.3d 776. We granted Teleflex's writ application to review that judgment. *Warren v. Shelter Mut. Ins. Co.*, 16-1647 (La. 1/13/17), 215 So.3d 246.

**DISCUSSION**

In this court, Teleflex asserts six assignments of error.

1. The district court granted a new trial without determining whether the issue on which it based that grant was material to the verdict or had prejudiced the plaintiff, or properly determining that there had been a miscarriage of justice, and the appellate court erred in affirming that ruling.

2. The court of appeal erred in affirming the trial court's rejection of proposed jury instructions informing the jury that the duty of a component part manufacturer to warn differs from that of the manufacturer of an end product sold to the public.

---

[1] The award of legal interest on compensatory damages was later confirmed in the trial court's grant of JNOV with regard to those damages. The trial court denied the plaintiff's motion for JNOV with regard to legal interest on punitive damages, which ruling the court of appeal affirmed. The issue of judicial interest on the award of punitive damages is not the subject of this opinion, and remains pending in this court under No. 2017-C-1657.

3

3. The court of appeal erred in affirming the trial court's decision in the second trial to "un-bifurcate" and allow punitive damages evidence and argument to be presented during the trial of liability, and further erred in failing to address the substantial prejudice and unfairness to Teleflex caused by un-bifurcation.

4. The court of appeal erred in affirming the trial court's finding of liability for punitive damages despite a lack of evidence of reckless, wanton, or callous conduct.

5. The court of appeal erred in affirming the trial court's acceptance of the amount of punitive damages, which is grossly excessive as a matter of federal maritime and constitutional law.

6. The court of appeal erred in failing to scrutinize fully the fairness and propriety of the verdict and judgment in this punitive damages case in light of: (a) the lack of evidence supporting punitive damages; (b) introduction into the case of passion and prejudice resulting from the failure to bifurcate liability from punitive damages; (c) erroneous instructions on the duties of Teleflex; and (d) a grossly disproportionate punitive damages award.

**Liability and Compensatory Damages**

Before we address these individual assignments, we will summarize the basis on which the jury found liability on the part of Teleflex, which Teleflex specifically assigned as error in the court of appeal. *Warren*, p. 35, 196 So.3d at 799-800. The court of appeal found no manifest error in the jury's finding that Teleflex had breached a duty owed to the plaintiff and that such breach had caused the plaintiff's damages. *Id.*, p. 36, 196 So.3d at 800. Although Teleflex challenges the process that resulted in that finding of liability as corrupted by the trial court's failure to bifurcate trial on the liability claim from trial on the punitive damages claim, and further corrupted by the trial court's refusal to instruct the jury on the duty of a component

4

part manufacturer, the court of appeal nevertheless affirmed the jury's verdict on liability and compensatory damages for failure to warn.

The plaintiff sought damages under general maritime law and the Louisiana Products Liability Act alleging Teleflex had failed to warn of the inherent danger in its product. The plaintiff's theory of liability at trial was that the steering system itself was defective due to an inherently dangerous risk that was not obvious to the user such that it required adequate warnings, and the warnings Teleflex had provided were not adequate. Teleflex's defense was that its product was not defective and that such warnings were not necessary, because the loss of fluid would result in tell-tale signs indicating to the operator that there was an issue with the steering system. Teleflex also asserted the leaks in the system in this case were caused by the replacement by an unknown party of one of the hydraulic hoses with a non-Teleflex hose, and that there were obvious signs of leaking fluid in the boat, which someone had attempted to resolve by using a pipe-wrench on the hose coupling.

> The court of appeal cited the law as follows, which Teleflex does not contest.

> In considering whether a warning in an instruction manual is inadequate because it should have been placed on the product itself, a court must consider the nature and severity of danger to be warned against, likelihood that the product will be used by persons who have not read the manual, practicality and effectiveness of placing the warning on the product itself, and any other relevant factors.

> *Jaeger v. Auto. Cas. Ins. Co.*, 95–2448, pp. 8–9 (La. App. 4 Cir. 10/9/96), 682 So.2d 292, 297, *writ denied*, 96–2715 (La. 2/7/97), 688 So.2d 498 (citing *Black v. Gorman–Rupp*, 94–1494 (La. App. 4 Cir. 5/16/95), 655 So.2d 717).

> In *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984) (footnote omitted), the federal Fifth Circuit stated:

> It is a fundamental principle of the law of product liability in this Circuit that a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold. *Borel* [v. *Fibreboard Paper Prods. Corp.*], 493 F.2d [1076, 1088–90 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)]; *see* Restatement (Second) of Torts,

Section 402 A. comment j. In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert. *Borel*, 493 F.2d at 1089. The lack of adequate warnings renders a product defective and unreasonably dangerous even if there is no manufacturing or design defect in the product. *Martinez v. Dixie Carriers, In*c., 529 F.2d 457, 465–66 (5th Cir.1976); *Reyes* [*v. Wyeth Labs.*,] 498 F.2d [1264,] 1272–73 [(5th Cir.1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).]

In *Hooker v. Super Products Corp.*, 98–1107, pp. 28–29 (La.App. 5 Cir. 6/30/99), 751 So.2d 889, 905, *writs denied*, 99–2911, 99–2947 (La.12/17/99), 751 So.2d 880, 884, the court stated:

Under the circumstances of this case, warnings should have been placed on the truck in such a manner that all operators could have been aware of the danger of being near the hose or hose shield on this particular vehicle. If there was any warning decal on the truck at all, it was definitely not on the side where plaintiff was working. The danger of being near a hose which could possibly rupture cannot be considered open and obvious, since handling a similar hose was part and parcel of plaintiff's usual occupation.

Once the trier of fact determines that the inherent danger is not obvious, and the consumer is not aware of or trained to detect that danger, then the warning, or lack thereof, must be scrutinized. *Clark v. Jesuit High School of New Orleans*, 572 So.2d 830 (La. App. 4th Cir.1990), *writ denied*, 576 So.2d 48 (La. 1991). Therefore, the warning must be: (1) properly worded to signify the intensity of the inherent danger in the product; (2) properly placed on the product so that the consumer cannot avoid seeing it; and (3) it must convey to the consumer that injury or damage can result from a normal or intended use of the product. *Id.* The manufacturer can then present evidence to show its product either did not require a warning or that the warning that was provided was adequately worded or placed. *Id.*

*Asbestos Plaintiffs v. Bordelon, Inc.*, 96–525 (La.App. 4th Cir.10/21/98), 726 So.2d 926.

Plaintiff testified that had he read a warning about the hose, he would have heeded it. In the present case there was no warning for plaintiff to see.

*Warren*, pp. 39-40, 196 So.3d at 801-02.

This summary of the applicable jurisprudence comports with the LPLA. In

*Jack v. Alberto–Culver USA, Inc.,* 06–1883, p. 4 (La. 2/22/07), 949 So.2d 1256,

6

1258, this court outlined a plaintiff's burden of proof in a products liability case, stating:

> To maintain a successful products liability action under the LPLA, a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous;" and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else. La. R.S. 9:2800.54(A).

"A product is 'unreasonably dangerous' under the LPLA if and only if the product meets at least one of [four] criteria," one of which is that "the product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in La. R.S. 9:2800.57." *Id.* In a failure to warn case, the claimant bears the burden of establishing that "at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. R.S. 9:2800.57. The LPLA defines "adequate warning" as:

> a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the danger for which the claim is made. La.R.S. 9:2800.53(9).

*Id.* at 1258–59. Whether a product is unreasonably dangerous due to an inadequate warning is a question for the trier of fact that is reviewed under the clearly wrong/manifest error standard. *Brooks v. State ex rel. Dep't of Transp. and Dev.,* 10–1908 (La. 7/1/11), 74 So.3d 187.

In this case, the Louisiana Department of Wildlife & Fisheries (Wildlife & Fisheries) investigated the accident and determined that the boat, which had been purchased pre-owned by Glen Vamvoras, lost its steering because of a hydraulic oil/fluid leak in one of the steering system's hydraulic lines at a hose/nut or coupling

assembly. Teleflex manufactured and supplied the boat's hydraulic steering system, SeaStar, but one of the original Teleflex hoses had been replaced by persons unknown with a non-Teleflex hydraulic hose.

Teleflex's SeaStar hydraulic steering system consists of three major parts. The helm pump is mounted to the steering wheel (installed underneath or alongside it; here, underneath). Connected to the pump are two fluid-filled hydraulic hoses that run under the boat deck to the back of the boat. There, the hoses connect to either end of a cylinder that is mounted horizontally to the front of the outboard motor. When the wheel is turned left or right, additional hydraulic fluid is pumped into the corresponding hose, which then forces the cylinder's piston to move the motor. The SeaStar is a system designed to move fluid, not consume it. If there is fluid loss, there is a leak, which may eventually happen due to connections using metal couplings and rubber O-rings. Air then gets into the line and changes the steering response, causing what is referred to as a spongy feeling by the compression of air.

At this point, the system can still be operated and the boat controlled, the court of appeal noted. But with enough fluid loss, control of the boat will be taken completely out of the hands of the driver, and the motor will go into a free spin, kicking completely to one side. The boat turns suddenly on its own axis, referred to in the industry as a "J-hook" or "kill spin." Occupants are often ejected and are immediately in danger of being struck by the spinning propeller, even if the throttle is shut down. The court of appeal found the evidence clearly revealed that Teleflex, a very sophisticated boating industry manufacturer, was well aware of this phenomenon.

Eric Fetchko, Vice President and General Manager of SeaStar Solutions, Richmond, British Columbia, went to work for Teleflex in 1986, and invented the SeaStar hydraulic steering system. He testified that Teleflex knew about the fluid

loss consequences but that they could not be designed out of the system. Teleflex had performed tests in 1989 and 2004 that confirmed that a very small loss of fluid in the hydraulic system could result in total failure of the steering system. There was a warning on the bottom of the steering cylinder, but the court of appeal found the warning did not warn of the risk of leaks, fluid loss, ejection, or death, nor was it visible from within the boat. Mr. Fetchko, and Teleflex expert Augusto Villalon, a consultant for the Coast Guard, each testified that "bumpy" or "mushy" steering should have adequately forewarned the Vamvorases of the imminent danger before noticing a leak in the hydraulic system. Mr. Fetchko testified he thought it had adequate warning in the noise and reduction and the degradation of steering. He stated the "mushy" feeling would be felt at the helm alerting the driver.

Mr. Villalon testified that, given his background, he knew what to expect with fluid loss in a hydraulic steering system. He later conceded that a click or mushiness means different things to different people and that people who do not understand it as a warning lack experience.

Stephen Killingsworth, an expert tendered and accepted in mechanical engineering, testified the "clicking" sound heard by the Vamvorases was normal according to Teleflex's own documents. He testified that, not only were these descriptive words subjective, but that the manual also failed to explicitly use any of these words to describe the malfunction indicators.

Sgt. Liles of Wildlife & Fisheries, an experienced boating professional, testified that all of the Wildlife & Fisheries boats had this type of hydraulic steering system, and no one knew that this could happen. He indicated the department was going to cover this issue in its future teaching program because the motoring public was unaware of the danger.

Glen and Daniel Vamvoras testified that they did not know of the danger from loss of fluid. Glen purchased the boat pre-owned; he testified that an owners' manual had not come with the boat, and that he had had the boat annually inspected. Glen stated that, while doing routine maintenance eight months prior to the accident, a friend suggested he add fluid to the system. Glen also stated that, though he added a few teaspoons of fluid, he did not believe this to be part of routine maintenance, and did not serve as an indicator of any issues with the steering system. Glen admitted that on more than one occasion the boat made an unidentifiable clicking sound, but only in reverse, and he had never had any issues with the steering system. Glen said that he never would have let his son Daniel drive the boat or put his friends in the boat if he had known of the danger. Daniel filed an affidavit stating that he would have heeded a warning if one had been provided.

Daniel testified that on the day of the accident he had detected a leak at the point of connection between a hydraulic hose line and a mechanical housing at a nut on the boat's outboard motor. He stated he then tightened the nut, believing he had solved the problem, and proceeded to take the boat out for the day. Daniel admitted he had heard a clicking sound coming from the boat on the day of the accident, but denied knowing the source of the sound or having any other issues with the boat.

In finding no manifest error in the jury's finding, the court of appeal noted that the American National Standard Product Safety Signs and Labels ("ANSI") publication provides guidance for manufacturers to alert users of their products to potential personal injury hazards inherent in their products. The court found the July 2006 manual, published a few months after this suit was filed, had partially complied with the 1991 ANSI standards, but concluded it was too late and too little to satisfy the warning requirements, because warnings in a manual are insufficient. The court

of appeal concluded the warnings should have been on the steering system itself, citing the ANSI definitions and provisions.[2]

The court of appeal noted that Mr. Killingsworth testified that, when a product has an inherently dangerous feature that cannot be designed out of the product, the manufacturer has a duty to warn of the specific danger. In this case, the court noted, the inherent danger was that a very small loss of fluid would result in loss of steering that could cause ejection and death. The court reasoned the warning needed to contain a signal or key word to get the user's attention, and the text needed to instruct the user to stop and repair fluid loss immediately to avoid the consequences. The court also found the warning needed to be placed where it would be seen and in proximity to the hazard. The court cited Mr. Killingsworth's testimony that Teleflex had a duty to put a sticker or decal on the front helm pump where the driver would see it at the wheel and where the oil is actually added. The court cited his testimony that another decal should be placed on the back cylinder of the steering system in a

---

[2] 4.11 safety sign: A visual alerting device in the form of a decal, label, placard, or other marking such as an embossing, stamping, etching, or other process which advises the observer of the nature and degree of the potential hazard(s) which can cause injury or death. It can also provide safety precautions or evasive actions to take, or provide other directions to eliminate or reduce the hazard.

4.11.2 product safety sign or label: Sign, label, or decal affixed to a product that provides hazard and safety information about that product.

4.11.2.1 permanent safety sign or label: Information affixed to a product to warn against potential exposure to hazards inherent in the normal use of or associated with the product, or which might be created during reasonably anticipated product use. The sign or label is to be permanently affixed to the product so that it cannot be easily removed.

5.1 Hazard classification
Product safety signs and labels are classified according to the relative seriousness of the hazard situation. The determination is based upon an estimation of the likelihood of exposure to the hazardous situation and what could happen as a result of exposure to the hazard. For products, there are three hazard classifications which are denoted by the signal works DANGER, WARNING or CAUTION.
....
9.1 Location
Product safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) alert the viewer to the potential hazard in time to take appropriate action.

position so that it could be seen at the site of the leak. The court found such warning labels would have been consistent with the ANSI standards, and were required by applicable law.

Here, the court reasoned, the driver of the boat attested that he would have heeded a warning had there been one, but the only text on the helm of the boat advised the operator to check the fluid level and hoses without any mention of the loss of steering resulting in ejection from the boat and possible death. The court of appeal found that, based on the evidence and the law presented, the jury was not manifestly wrong in finding that the Teleflex system had an inherent danger unknown to users, that Teleflex had a duty to warn users of such dangers, and that Teleflex was negligent in its failure to warn. Thus, the court of appeal affirmed the finding of liability for compensatory damages. Teleflex has not assigned error in the court of appeal's conclusion.

**New Trial**

We now turn to the issues raised by the defendant, which it claims infected the fact-finding process. With regard to the grant of the new trial, some background is in order. During the first trial, the plaintiff introduced a manual on the SeaStar steering system, which the plaintiff's expert used to refer to diagrams therein to explain his testimony about the hydraulic steering system. When that manual came to be introduced in evidence, there was some discussion as to which manual: the 1997 version that would have been supplied with the boat at its original sale in 1998, except that Mr. Vamvoras testified there was no manual in the boat when he purchased it used, or a 2006 revision. Counsel for Teleflex indicated the plaintiff could use either one. It was later determined the 2006 revision was the manual ultimately introduced in evidence as P-24, though there was no reference to the date of the manual at the time it was introduced. After the jury retired to deliberate, it sent

12

in a written request for a copy of the SeaStar steering system manual and the ANSI guidelines. Approximately forty minutes later, the jury sent the judge a question asking whether it had been given the 1997 manual that would have been available with the original purchase of the boat in 1998. The trial court then called a bench conference, at which Teleflex's attorney assured the court that the jury had the manual provided with the boat in 1998. The jury foreman informed the trial court that the manual looked to be a 2006 revision and pointed out to the court the back of the manual, which had the following:

©1997 TELEFLEX CANADA LIMITED PARTNERSHIP
PRINTED IN CANADA
FORM NO.296784 10000–07/06 Rev AK

The following exchange then occurred:

MR. FROHN: That's just a printer's code of some kind.
THE COURT: That's not a revision date?
MR. FROHN: No, that's a—that's got to be a printer's code—
THE COURT [ADRESSING THE JURY]: No. This is what purports to be the manual that was available, or that was produced in connection with the device that was in the boat. Yeah.

(Whereupon the jury exit[ed] the courtroom to deliberate.)

The jury returned thirty minutes later with a verdict finding no liability on the part of Teleflex for a failure to warn.

The plaintiff filed a motion for a new trial asserting both peremptory and discretionary grounds under La. Code Civ. P. art. 1972(1) ("A new trial shall be granted, upon contradictory motion of any party … [w]hen the verdict or judgment appears clearly contrary to the law and evidence."), and La. Code Civ. P. art. 973 ("A new trial may be granted in any case if there is a good ground therefor, except as otherwise provided by law."). The motion included excerpts from Eric Fetchko's deposition explaining the import of the markings on the last page of a particular manual, such that "15000-03/02 Rev. R," for example, indicates the manual would

13

have been revised in March of 2002. Thus, as the court of appeal noted, the manual actually provided the jury at its request was the July 2006 revision, instead of the 1997 SeaStar manual that would have been distributed with the sale of the boat in 1998.

The trial court gave the following reasons for granting the new trial, pursuant to discretionary grounds under Art. 1973:

> The Court recollects the conversation that we had when the jury came back and had some concerns about the manual that they were looking for and whether it was the actual manual that would have been in the boat at the time it was shipped out and would have been the manual that would have been available for the Champion boat with the Teleflex steering when it was manufactured.
>
> In some respects I feel responsible for saying that this is the manual that is—that is applicable to this particular case. I did so based upon the assurances by counsel for Teleflex that the markings were not revision dates at all, but were, in fact, printer's marks or words to that effect. It's now my belief that that information was inaccurate. Although it was not objected to, it obviously was important to the jury in making a determination about whether or not they believed that there was any fault committed by Teleflex in connection with this case. How they would have viewed the actual manual compared to what they did view, I don't have a clue. But I do feel like that it's basically a miscarriage of justice that they were given the wrong information and had they had the right information—had I said, "You've got to rely on your memory. I can't tell you what it is." What they would have done with that manual that they had that was revised in '06, I don't know. I can't speculate, but it was important enough to them that they came back and asked about it. It was important enough to them that they looked at it. And if it was important enough to them, then it's important enough that we give them accurate information or we tell them to rely on their memory. I didn't do that, so I'm going to grant the motion for a new trial only as against Teleflex.

It is clear the trial judge granted a new trial pursuant to the discretionary grounds of Art. 1973 rather than peremptory grounds of Art. 1972(1). La. C.C.P. art. 1973 provides the trial court with discretionary authority to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law." When the trial judge is convinced by his examination of the facts that the judgment would

14

result in a miscarriage of justice, a new trial should be ordered pursuant to La. C.C.P. art. 1973. *Pitts v. La. Med. Mut. Ins. Co.*, 16-1232 p. 8 (La. 3/15/17), 218 So.3d 58, 65 (citing *Horton v. Mayeaux*, 05-1704 (La. 5/30/06), 931 So.2d 338, 344; *Lamb v. Lamb*, 430 So.2d 51, 53 (La. 1983)). In *Pitts*, we explained the proper standard to apply in ruling on a motion for new trial pursuant to either Art. 1972(1) or Art. 1973, as well as the proper appellate standard of review of the trial court's rulings pursuant to those articles:

> [I]n considering whether to grant a new trial under La. C.C.P. art. 1972(1), a trial judge may evaluate the evidence without favoring either party, and draw its own inferences and conclusions. [*Martin v. Heritage Manor S. Nursing Home*, 00-1023 (La. 4/3/01), 784 So.2d 627, 637]. Most significantly, the district court has authority to evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. *Id.*; *Davis v. Wal Mart Stores, Inc.*, 00-0445 (La. 11/28/00), 774 So.2d 84, 93. However, because a motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations, the jury's verdict cannot be set aside on that ground if it is supportable by any fair interpretation of the evidence. *Id.*

> The applicable standard of review in ruling on a motion for new trial is whether the district court abused its discretion. *Davis v. Witt*, 02-3102 (La. 7/2/03), 851 So.2d 1119, 1131; *Martin*, 784 So.2d at 632. In reviewing the district court's grant of a new trial under La. C.C.P. art. 1972(1), we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. *Davis*, 774 So.2d at 93. When the district court grants a new trial based on Article 1972(1), the jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. *Martin*, 784 So.2d at 637. Furthermore, this court has recognized that the district court has much discretion in determining whether a new trial should be granted pursuant to Article 1973. *Lamb*, 430 So.2d at 53; *see also* La. C.C.P. art. 1971, Official Comment (d). We have explained that, generally, "the only requirement has been that the district court state an articulable reason or reasons as to why he is exercising his discretionary powers." *Horton*, 931 So.2d 338, 344 (internal citation removed). Unless an abuse of this discretion can be demonstrated, a district court's action in granting or denying a new trial on discretionary grounds will not be reversed. *Id.*

15

*Pitts*, pp. 9-11, 218 So.3d at 66; *see also Pitts*, 218 So.3d at 79-80, Guidry, J., concurs.

In the instant case, the trial court clearly stated an articulable reason for exercising its "much discretion" in ruling on the motion for new trial pursuant to Art. 1973. *Pitts*, p. 11, 218 So.3d at 66. Teleflex argues the trial court abused that discretion because it failed to articulate a legally sufficient reason to find a miscarriage of justice. Teleflex, as it did below, argues the manual itself, whether the 1997 or 2006 version, was not at issue because the plaintiff's liability theory was solely that a warning sticker should have been affixed to the Champion boat. Teleflex points out that it did not use the manual as a defense, and that plaintiff's expert testified the manual was "immaterial." Teleflex contends the trial court's regret in responding to the jury's question does not show materiality of the misstatement or a miscarriage of justice because the trial court should have analyzed the significance of the manual, and its date, to determine whether it was material. Additionally, Teleflex points out that plaintiff failed to object to the judge's statement. Teleflex contends a failure to object despite a specific opportunity to do so, to allow error to be corrected, should not entitle a litigant to a new trial, especially one who may have sat on his hands. Teleflex argues the plaintiff played a role in creating the issue, by introducing the manual ostensibly to allow his expert to testify about the hydraulic steering system, without attributing a date, despite his inability to rely on the manual under *Bloxom v. Bloxom*, 512 So.2d 839, 850-51 (La. 1987) (a plaintiff in a failure to warn case cannot cite a manual the plaintiff did not read, though he may claim the manufacturer should have added a warning sticker). Teleflex further contends the 2006 manual actually helped the plaintiff's case and hurt Teleflex, because the later manual, with even more warnings therein than the

1997 manual, supported plaintiff's theory of the case because it showed that Teleflex knew of the risk, but included no sticker.

The plaintiff supports the trial court's reasoning, noting that the jury specifically requested both the manual supplied with the boat and the ANSI guidelines, for which it clearly had some purpose, and which it closely reviewed – close enough to discern the date marks on the final page. Here, the plaintiff argues, the trial court, though prohibited from commenting on the facts of the case in the presence of the jury, *see* La. Code Civ. Proc. art. 1791, acknowledged it had given the jury false information, information that was provided by Teleflex, the victorious party. The plaintiff contends the trial court did not abuse its discretion in granting a new trial because it was convinced, after examination of the facts, that to let the judgment stand would result in a miscarriage of justice. The plaintiff argues that an objection should not preclude the granting of a motion for new trial, pointing out that a trial court may grant a new trial on its own motion, the error in this case may have been mutual, given the confusion surrounding the dates on the manuals, and the error in this case was not simply procedural, but substantive and fundamental: the jury was given false information during deliberations. The plaintiff contends the trial court's mistake regarding the manual was in fact material, because there should have been no applicable manual warnings for the jury to consider, or the jury should have been told to rely on the evidence, or the jury should have been given correct information. Had either of those happened, the jury would not have had an applicable manual in the jury room. As to materiality, the plaintiff posits that the jury would not have wanted to know if the manual was the manual supplied with the boat if it were not pivotal to the jury's decision. The jury should not have been given any information, and if it had been, that information should have been correct, the plaintiff maintains.

Examining the record before us, we agree with the court of appeal majority that the trial court did not abuse its much discretion in granting the plaintiff's motion for new trial. Although Teleflex argues the manual was irrelevant to the plaintiff's theory of the case, because the Vamvorases never had a manual and the manual was itself not relevant to the plaintiff's failure to warn claim, the fact remains that the jury was given a manual, which it was told was the manual provided with the boat at the time of its original sale. As the court of appeal points out, the 2006 manual contained far more warnings than the actual 1997 manual, including "Danger" warnings the manual explained pertained to "immediate hazards which WILL result in severe personal injury or death," and "Warning" labels the manual stated pertained to "Hazards or unsafe practices which COULD result in severe personal injury or death." As the court of appeal majority noted, the manual provided to the jury contained seventy-nine "Warning" labels, as opposed to the nine warning labels in the 1997 manual; therefore, a jury in a "failure to warn" case looking at the 2006 manual after being assured that it was the manual supplied with the boat, could have concluded the manufacturer of the steering system had fulfilled its duty to warn "by the sheer number of warnings, even if the decal on the system itself did not meet ANSI standards."

We find no error in the court of appeal's comparison of the 1997 manual, even though it was never introduced in evidence in the first trial, to the 2006 manual, which the jury was provided, because the jury was told by the judge that it had received the 1997 manual supplied with the boat. The trial court believed the manual "was important enough to the jury in making a determination about whether or not they believed that there was any fault committed by Teleflex in connection with this case." The trial court could not say what the jury would have done had they been given correct information, but found it "basically a miscarriage of justice that they

were given the wrong information…." Clearly, the trial court believed it had so mishandled the jury's request that a new trial was warranted. *Compare Pitts*, *supra*, in which this court affirmed the trial court's discretionary grant of a new trial under Art. 1973 on the basis that the trial court had properly articulated a miscarriage of justice because it believed the jury had been confused by the testimony of the defense experts and had applied the wrong standard of care to the defendant. 218 So.3d at 63-64. Because the trial court articulated a reason for finding a miscarriage of justice, we cannot say the trial court abused its much discretion in granting a new trial, or that the court of appeal majority erred in affirming that ruling.

**Jury Instructions**

In this assignment of error, as it did below, Teleflex asserts the trial court erred in refusing to give a proposed jury charge as to the duty of component part manufacturers; a duty it argues is crucially different from the duty of the boat manufacturer. Teleflex claims its steering system was sold to boat manufacturers for use on a wide variety of boats, including pontoons, houseboats, ski boats, yachts, and sailboats. Teleflex points out that only on boats that run at high speed, on plane, is there danger of an uncontrolled spin resulting in ejection that, plaintiff argued, required a warning on the boat itself. Teleflex argues this risk does not exist when its steering system is used on other boat types. Thus, Teleflex asserts this case exemplifies one where the component could be incorporated into a variety of finished products, only some of which present the danger giving rise to the type of warning that plaintiff argued for here. Here, Teleflex points out, the owners manual provided by the boat manufacturer acknowledged this risk when it warned of "boat spinout" or "ejection" when operating on plane. Teleflex points out that, when installed on boats that do not plane, steering loss does not result in the kind of spin that might eject a passenger.

19

Teleflex notes that a component part manufacturer discharges his duty by providing necessary instructions and warnings to the sophisticated manufacturer of the finished product. It acknowledges that a duty remains to provide reasonable warnings, but it insists the duty does not extend to the end users of integrated products. The plaintiff counters that the trial court correctly refused to give a component part instruction because Teleflex manufactured a steering "system," with a manual and warnings of its own, rather than a component part such as an "O-ring".

With regard to the duty of component part manufacturers, Restatement (Third) of Torts: Prod. Liab. § 5 states in pertinent part:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
> (b) (1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
> (3) the defect in the product causes the harm.

Although Teleflex argues that neither circumstance was present in this case, the court of appeal correctly pointed out that because the plaintiff's theory of liability at trial was that the steering system itself was defective due to an inherently dangerous risk that was not obvious to the user such that it required adequate warnings, and the warnings were not adequate, part (a) of § 5 was indeed applicable. However, the instruction Teleflex asked the trial court to give to the jury stated as follows:

> Product component parts include products that can be put to different uses depending on how they are integrated into other parts. The manufacturer of a component part is ordinarily not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another manufacturer utilizes the component part. A safety

20

feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation. The same considerations also weigh against imposing a duty on the manufacturer of the component part to warn purchasers of the component part, or end-users of the completed part, of dangers arising from special adaptations of the component part by other manufacturers.

Teleflex concedes that federal courts employ the Restatement (Third) of Torts: Product Liability in applying federal maritime law, including specifically the component parts doctrine articulated in §5. Teleflex Br., p. 12, n. 64. Teleflex's proposed instruction is drawn from Restatement (Third) of Torts: Prod. Liab. § 5 § 5 comment d (1998). However, as the court of appeal noted, this language is a partial paraphrase of comment d, one of the five comments to §5, rather than the exact language of § 5.

The court of appeal reasoned the isolated comment was not a fair representation of the law. The court of appeal found the language misleading because the Teleflex SeaStar hydraulic steering system at issue was specifically designed and marketed for installation in boats with high-horsepower single engine and twin engine motors. The court of appeal found, therefore, that any reference to a "specific adaptation" was not relevant in this case.

§ 5, comment d states as follows:

Incomplete products. Product components include products that can be put to different uses depending on how they are integrated into other products. For example, the chassis of a truck can be put to a variety of different uses. A truck chassis may ultimately be used with a cement mixer or a garbage compaction unit or in a flat-bed truck. Similarly, an engine for industrial machines may be adapted to a variety of different industrial uses. A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation. The same considerations also militate against imposing a duty on the seller of the incomplete product to warn purchasers of the incomplete product, or end-users of the integrated product, of dangers arising from special adaptations of the incomplete product by others.

21

The court of appeal found the hydraulic steering system was not put to different uses, because it was manufactured for boats, and it was installed in a boat. The court of appeal pointed out that the reporters' notes under comment d indicate that the truck chassis referenced in the comment was taken from cases like *Verge v. Ford Motor Co.*, 581 F.2d 384 (3d Cir.1978), holding the chassis cab manufacturer had no duty to install a back-up alarm that was needed to make the ultimate end product, a garbage truck, safe. The court of appeal found that Teleflex's steering system was not similar to the generic truck chassis in the example above; thus, it reasoned giving only the partial language from one comment was not an adequate statement of the law.[3]

The trial court declined to give the proposed instruction on the basis that the steering system did not "fit" the definition of a component part in the context of the jury charge, because, although it was a component part of the boat, it was a system designed to perform a certain function. The court of appeal did not reach that issue, instead concluding that the proposed jury charge was not representative of the substance of the law on component parts, and thus the trial court acted within its discretion in refusing to give the proposed instruction.

We agree with the court of appeal's reasoning and also find no error in the trial court's refusal to give the proposed instruction. It is well settled in Louisiana jurisprudence that "an appellate court must exercise great restraint before it reverses

---

[3] Comment b follows the language of the actual Restatement (Third) of Torts: Prod. Liab. § 5(a), where it states: "Liability when a product component is defective in itself. A commercial seller or other distributor of a product component is subject to liability for harm caused by a defect in the component." As the court of appeal noted, comment b references other sections of Restatement (Third) of Torts: Prod. Liab. to illustrate that the liability for a component part manufacturer is the same as the liability of the product manufacturer if the component part is defective and caused the plaintiff's harm. Comment b under § 5 further states that "[t]he same principles apply in determining a component seller's duty to supply reasonable instructions and warnings to the component buyer."

a jury verdict because of erroneous jury instructions." *Nicholas v. Allstate Ins. Co.,* 99–2522, p. 8 (La. 8/31/00), 765 So.2d 1017, 1023. "The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed as long as the charge correctly states the substance of the law." *Id.*, citing *United States v. L'Hoste,* 609 F.2d 796, 805 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). In the assessment of an alleged erroneous jury instruction, the reviewing court must assess such impropriety in light of the entire jury charge to determine if the charge adequately provides the correct principles of law as applied to the issues framed in the pleadings and evidence, and whether the charge adequately guided the jury in its deliberation. *Id.*, citing *Kaplan v. Missouri-Pacific R.R. Co.,* 409 So.2d 298, 304-05 (La. App. 3 Cir.1981). Ultimately, as we explained in *Nicholas*, "the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Id.*, citing *Brown v. White,* 405 So.2d 555, 560 (La. App. 4 Cir.1981), *aff'd*, 430 So.2d 16 (La.1982).

We agree with the court of appeal that the jury charge as a whole correctly stated the substance of the law on defective products and did not mislead the jury or prevent it from dispensing justice. The proposed instruction, on the other hand, did not adequately provide correct principles of law as to the issues framed in the pleadings and evidence. The plaintiff's case was based on his theory that the steering system itself was defective due to an inherently dangerous risk that was not obvious to the user such that it required adequate warnings, and the warnings were not adequate. We find, as did the court of appeal, that Teleflex's hydraulic steering system was not a "special adaptation" within the meaning of the Restatement (Third) on Torts simply because there was a greater risk of spin out and ejection when certain types of boats were on plane. The record is replete with evidence that the defendant's

23

steering system was designed for installation in boats and, in this case, was installed in a boat; there is no evidence the system could be installed in other vehicles or used in different circumstances. As the plaintiff points out, the cover of the Teleflex manual itself identifies SeaStar as "Hydraulic Steering for Outboard Powered Vessels." That the risk of injury was greater in some types of boats compared to others did not relieve Teleflex of its duty as a manufacturer to warn against all reasonable uses and misuses of its steering system, and the trial court properly instructed the jury that Teleflex could be liable when the component part itself is defective. *See* Restatement (Third) on Torts, §5 (a). Accordingly, the trial court correctly rejected the proposed instruction on component part manufacturers.

**Refusal to Bifurcate Second Trial**

Teleflex next argues the trial court erred in not bifurcating the second trial on the issues of liability and punitive damages. Not doing so, Teleflex argues, allowed the jury to be swayed with incendiary evidence and arguments for punitive damages. Teleflex asserts it was substantially prejudiced as a result and that the judgment should be vacated. Teleflex and some of the amici curiae, citing statutes and decisions from other states providing for bifurcated trials of liability and punitive damages, invite this court to set a judicial rule that the practice of trying liability and punitive damages together is impermissible. The plaintiff counters that the trial court specifically stated its reason for not bifurcating the second trial: in the first trial one defendant was subject to punitive damages and the others were not, whereas Teleflex was the only defendant at the second trial. The plaintiff asserts the only question before the court is whether the trial court abused its discretion in choosing to try both liability and punitive damages in the same trial, and in this case, Teleflex has shown no abuse of that discretion.

"The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." La. Code Civ. P. art. 1631(A). Thus, it is certainly within the discretion of the court to order bifurcation of trial on the issues of liability and punitive damages in the appropriate case. The plaintiff cited La. Code Civ. Proc. art. 1562(A) for the proposition that a trial cannot be bifurcated without consent of all the parties. That article provides as follows (emphasis supplied):

A. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial the court may order, *with the consent of all parties,* separate trials on the issues of liability and damages, whether or not there is to be a jury trial on either issue.

*B.* If a defendant has been found liable by a jury, *the court shall proceed* with the trial on the remaining issues *before the same jury unless all parties consent to a trial before a different jury.*

C. Notwithstanding the provisions of Paragraph B of this Article, in a jury trial, the court may order, *with the consent of all the parties,* that a separate trial on the issue of damages shall precede a trial on the issue of liability.

D. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial on the merits, the court may order, *with the consent of all parties*, a separate trial on the issue of insurance coverage, unless a factual dispute that is material to the insurance coverage issue duplicates an issue relative to liability or damages. The issue of insurance coverage shall be decided by the court alone, whether or not there is to be a jury trial on the issue of liability or damages.

As the court of appeal noted, whether a trial court must always bifurcate liability and punitive damages has been considered by at least one court in this state. *See Myers v. National Union Fire Insurance Co. of Louisiana,* 11–751 (La. App. 4 Cir. 4/4/12), 90 So.3d 522, *writ denied,* 12–1017 (La.6/22/12), 91 So.3d 975. There, passengers injured as the result of a helicopter crash sued various parties and insurers

and brought a product liability case against the helicopter manufacturer. The trial court ordered punitive and compensatory damages to be tried together. On appeal, the manufacturer asserted the order was improper because its liability for punitive damages pursuant to maritime law would have to be tried along with compensatory damages, citing La.Code Civ.P. art. 1562. The court in *Myers* found nothing in Article 1562 to prohibit trying the damages before the same jury, nor was it convinced the jury would be unduly influenced or confused by trying the issues together.

The court of appeal in the instant case similarly found no abuse of the trial court's discretion. As the court noted, Art. 1562 only allows bifurcation in all four paragraphs therein "with the consent of the parties." In this case, bifurcation was clearly not consented to by all the parties. Teleflex argues it was prejudiced by the trial court's failure to bifurcate liability and punitive damages, citing the plaintiff's improper argument that Teleflex had not taken steps to correct the defective warning after the accident occurred, when in fact it had done so. Teleflex maintains it was prevented from arguing that it had taken such steps because such a position would have compromised its defense on liability and compensatory damages. However, we find Teleflex had other remedies available to it such as an objection or a limiting instruction. In fact, as the plaintiff points out, the trial court instructed the jury to treat Teleflex fairly and without prejudice, and specifically instructed the jury that "you can't hold somebody liable simply because they've got a lot of money." While there may be valid policy reasons for mandatory bifurcation of liability and punitive damages, we believe such policy determinations are better left to the legislature. In the instant case, we can discern no abuse of the trial court's discretion in not bifurcating trial on the liability and punitive damage issues.

**Punitive Damages**

It is well-settled in Louisiana that punitive damages are available only where authorized by statute. *See Mosing v. Domas*, 02-0012 (La. 10/15/02), 830 So.2d 967, 973; *Ross v. Conoco, Inc.*, 02-0299, p. 14 (La. 10/15/02), 828 So.2d 546, 555. However, as the parties do not dispute, this is a wrongful death case brought under the general maritime law. Although this court has yet to speak specifically on the issue, the appellate courts of this state have found punitive damages to be an available remedy under maritime law. *See Rebardi v. Crewboats, Inc.*, 04-0641 (La. App. 1 Cir. 2/11/05), 906 So.2d 455; *Poe v. PPG Industries*, 2000-1141, p. 6 (La. App. 3 Cir. 3/28/01), 782 So.2d 1168, 1173, *writ denied*, 2001-1239 (La.6/22/01), 794 So.2d 801; *Williams v. State Through Dept. of Wildlife and Fisheries*, 95-2456 (La. App. 1 Cir. 11/20/96), 684 So.2d 1018, *writ denied*, 96-3069 (La.3/7/97), 689 So.2d 1372; *Ellender v. Texaco, Inc.*, 93-1803 (La. App. 1 Cir. 6/24/94), 640 So.2d 845, *writ denied*, 94-2339 (La. 9/30/94), 642 So.2d 883. Punitive damages are available as a remedy in general maritime actions where a defendant's intentional or wanton and reckless conduct amounted to a conscious disregard for the rights of others. *Rebardi*, 906 So.2d at 457-58, citing *Poe*, p. 6, 782 So.2d at 1173; *Williams*, p. 5, 684 So.2d at 1022. The Supreme Court has held that punitive damages under common law for wanton, willful, and outrageous conduct extends to claims arising under federal maritime law. *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 411 (2009) (allowing punitive damages in maintenance and cure actions); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501-02 (2008). The United States Fifth Circuit, too, has held that punitive damages are recoverable under general maritime law for acts that are willful, wanton, and in callous disregard for the safety of others; this requires a showing of bad faith. *See Harper v. Zapata Off–Shore Co.,* 741 F.2d 87 (5th Cir.1984). "In order to recover punitive damages in a maritime case, a plaintiff must establish a higher degree of fault than simple negligence." *Bergeron*

*v. Mike Hooks, Inc.*, 626 So.2d 724, 728 (La. App. 3rd Cir.1993). In *Bonnette v. Conoco, Inc.*, we explained that, in proving a claim for exemplary damages under former La. C.C. 2315.3 (repealed in 1996), "[wanton and reckless conduct means] the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position, or that the defendant engaged in 'highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.'" 01-02767 (La. 1/28/03), 837 So.2d 1219, 1237, quoting *Billiot v. B.P. Oil Co.*, 93-1118, pp. 16-17 (La. 9/29/94), 645 So.2d 604, 613); *see also Exxon*, 554 U.S. at 493-94 ("Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it.").

In challenging the punitive damages award, Teleflex first contends there was no evidence of wanton, reckless, or callous conduct, and argues the record does not support an award of punitive damages. Teleflex contends there was no intent to harm, no evidence of concealment, no evidence of knowledge of prior similar accidents, no evidence Teleflex ignored industry boating standards, no evidence that the fact pattern here was foreseen and disregarded, and no evidence of a conscious choice that Teleflex considered, then rejected, a warning sticker. Teleflex contends that for fifteen years, with more than a million SeaStar systems in use world-wide, the record reveals no prior accidents of this type. Teleflex argues that it could not have foreseen the events that transpired here, and that there was no evidence of wanton or reckless conduct when the product was sold. Mr. Warren responds that Teleflex recklessly chose not to warn users of its product's inherently deadly risk that was not obvious to the public. The court of appeal concluded the evidence in the record supports the jury's finding that an award of punitive damages was appropriate. We find no error in that determination, as the record contains evidence

on which the jury could have reasonably found the defendant had acted recklessly in not placing on the steering system a visible sticker warning that loss of fluid could result in sudden loss of steering, ejection, and even death. "Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know…of facts which create a high degree of risk of…harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." *Exxon*, 554 U.S. at 493-94 (quoting 2 Restatement § 500, Comment a, pp. 587-88 (1964)).

As the court of appeal noted, Teleflex knew about the potential consequences on the loss of steering from a small amount of fluid loss some nine years before the system was sold and sixteen years prior to the accident. The jury, the court found, could been influenced by the startling results of the tests and considered it wanton and reckless to ignore such results when an inexpensive sticker costing some thirty cents could have saved a life. The court additionally found callous disregard for the safety of others in the terminology and testimony of the system's designer, Eric Fetchko.

The evidence before the jury included much testimony regarding the testing of the effect that hydraulic fluid loss has on the function of the helm. It was demonstrated to the jury that just a 3.2-teaspoon loss of hydraulic fluid could be the difference between driving the boat and losing all control. The court of appeal cited the magnitude of the risk that could result from the loss of such a small amount of fluid, even though the designer of the system testified it was designed so that a user could drive the boat and never be required to add fluid for the lifetime of the boat. As the court noted, the jury heard testimony regarding the fact that many end

consumers would not have known of the seriousness and magnitude of the risk from the loss of steering fluid. The jury implicitly considered the ease with which the risk could have been remedied, the court noted, which had been a well-established safety standard for some time.

The court highlighted the testimony of Mr. Fetchko as providing a basis on which the jury could have found a callous disregard for the safety of others. Mr. Fetchko testified Teleflex did not want to cause "mass hysteria" by putting a more specific warning on the product itself, analogized a warning sticker on the boat to a warning on an airplane ticket that if the motor stopped, the plane could fall out of the sky, and compared the need for a warning to the need for warning not to slam your knuckles in a car door. Mr. Fetchko testified that Teleflex had assumed that the different feel in the steering response would alert users that they had a problem.

However, the standards for applicable warnings were published in 1991, the court noted, seven years before the system was sold. Teleflex's own testing had given it knowledge in 1989 that total failure of its steering system could occur depending on minor incremental losses of hydraulic fluid. Mr. Fetchko admitted that Teleflex had received thousands of complaints regarding fluid loss, the court noted, but he had maintained that such a number must be viewed in the context of the millions of systems Teleflex had sold. The court reasoned that "the jury could have found the murky soup of logic hard to follow, that is, that the same company that received thousands of complaints of fluid loss also knew that a minimal amount of fluid could end in death; but the frequency was not high enough to justify a valid and effective warning." *Warren*, p. 45, 196 So.3d at 804-05. Tellingly, Mr. Fetchko admitted the following: that with one incremental drop, the operator could lose total control; that if the operator does not know how much he has lost, he should either stop or drive the boat very slowly back to shore; that if the operator does drive it

30

back and gets up on plane, he could be ejected and killed; and that nowhere on any of the SeaStar products on that boat did it say: "Steering fluid leak means stop." "In hindsight," he agreed these statements were correct.

After reviewing the record, we find the court of appeal properly applied the manifest error/clearly wrong standard to find the evidence in the record supported the jury's finding by a preponderance of the evidence that Teleflex had acted wantonly, recklessly, or in callous disregard for the safety of its customers. The evidence showed that Teleflex was well aware that a small fluid loss could result in total loss of steering control, that there had been numerous complaints about fluid loss, that total loss of steering control when the boat was on plane could result in ejection and severe injury, that applicable standards at the time the product was sold provided for a warning sticker on the product itself, and that it had had the opportunity to warn. Yet, as the record shows, Teleflex failed to take any action to advise its end users of the risk of severe injury and possible death. This failure was more than simple negligence. Instead, it evinces a conscious disregard for, or indifference to, the safety of its customers, justifying the imposition of punitive damages.

**Excessiveness**

Teleflex next asserts the jury's award is excessive as a matter of federal maritime and constitutional law. Teleflex argues the lower court, even though it properly applied *de novo* review, failed to apply controlling federal law on the limit of punitive damages awards. Teleflex focuses on the 1:1 ratio of punitive damages to compensatory damages articulated in *Exxon*, 554 U.S. at 501-02, for general maritime cases, and asserts the Supreme Court has since described this ratio as a "recovery cap," citing *Atlantic Sounding Co.,* 557 U.S. at 424 n. 11. Teleflex points out that the jury's punitive damages award in this case is an impermissible 184:1

31

ratio to compensatory damages. It further argues the lower court erred in considering the element of potential harm from due process cases, rather than maritime cases, like *Exxon*, in which Teleflex claims the majority specifically rejected consideration of potential harm. Thus, Teleflex argues the court of appeal erred in theorizing that, had Derek lived and suffered severe disability, damages could have exceeded $10,000,000, and then compounded that error by selecting an arbitrary figure of $8,000,000 with which to compare the punitive damages award, reducing the ratio to 2.8:1 and concluding it met federal requirements. Finally, Teleflex argues there was no basis in the record on which to conclude that Teleflex's conduct was additionally blameworthy because it had made a conscious decision to put profits ahead of safety. Teleflex contends the only evidence cited by the majority was Fetchko's use of the word "hysteria," which the court erroneously characterized as evidence of motive and intent.

The plaintiff counters that there is no bright line rule and that *Exxon* did not set a recovery cap for punitive damages in all maritime cases at a 1:1 ratio. Moreover, the plaintiff argues, the instant case is distinguishable from *Exxon* because this case presents earmarks of exceptional blameworthiness on the part of the defendant.

Because Teleflex has raised constitutional issues, the court of appeal properly invoked a *de novo* review of the record to determine whether the punitive damages awarded by the jury violated substantive due process. In *Mosing*, we held that when an appellant has properly raised a federal due process claim in the lower courts, pursuant to *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), the reviewing court must conduct a *de novo* review of the exemplary damage award, utilizing the three "guideposts" set out in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *Mosing*, 02-0012, p. 10, 830 So.2d at 975. In *BMW*, the

32

Court ruled that exemplary damage awards that are "grossly excessive" violate the Due Process Clause of the Fourteenth Amendment. The *BMW* Court then provided three "guideposts" for gauging when an exemplary damage award crosses the constitutional line: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the exemplary damage award and the harm the defendant's conduct caused, or could have caused; and (3) the size of any civil or criminal penalties that could be imposed for comparable misconduct. *Mosing*, 02-12, p. 6, 830 So.2d at 972.

In *Mosing*, we recognized a non-*BMW* factor traditionally considered by Louisiana courts is the defendant's wealth. 02-0012, p. 16, 830 So.2d at 978. We explained that a defendant's assets and income are relevant factors to be considered in determining whether an award of exemplary damages is excessive. *Id.* We stated: "The importance of the defendant's financial situation to the goals of punishment and deterrence is obvious: What 'may be awesome punishment for an impecunious individual defendant [may be] wholly insufficient to influence the behavior of a prosperous corporation.'" 02-0012, p. 16, 830 So.2d at 978-79 (citations omitted). Nevertheless, we cautioned that a defendant's economic circumstances was but one of the factors that may be considered in determining whether an award of exemplary damages is excessive. *Id.*, 830 So.2d at 979.

We first address the issue of whether *Exxon* set forth a 1:1 ratio recovery cap for punitive damages in general maritime cases. Teleflex argues the lower courts erred in not reducing the jury's award of punitive damages in accordance with *Exxon*, where the Court reduced a punitive damages award applying a 1:1 ratio to compensatory damages. Although *Exxon* may not have set forth a "recovery cap" per se, we find the Court in *Exxon* was expressly attempting to set a "fair upper limit" for punitive damages "in cases with no earmarks of exceptional blameworthiness within the punishable spectrum..., cases…without intentional or malicious conduct,

33

and without behavior driven primarily for gain…, and cases…without the modest economic harm or odds of detection that have opened the door to higher awards." 554 U.S. at 513. Before examining the Court's recent pronouncement in *Exxon*, we will review the cases leading up to that decision.

In 1991, the Supreme Court decided *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1 (1991). There, the Court conducted a substantive review of an award of punitive damages. In *Haslip*, an insurance fraud case, the agent pocketed the premiums and caused the plaintiff's insurance to lapse. *Id.* at 4–5. The Court upheld a punitive damages award that amounted to four times the award of compensatory damages and 200 times the out-of-pocket costs of the defrauded insured. *Id.* at 23–24. Although the ratios might be "close to the line," the Court said the award had to be upheld because it "did not lack objective criteria." *Id.* The Court therefore concluded the punitive damages did not "cross the line into the area of constitutional impropriety." *Id.* The Court did not define any bright line of constitutional impropriety.

In 1993, two years after *Haslip,* the Court took on another major punitive damages case. In *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443 (1993), the Court reviewed a jury award of $19,000 in compensatory damages and $10 million in punitive damages. *Id.* at 451. That case arose out of an oil and gas development fraud scheme. *Id.* at 447–51. The plurality, reiterating that due process places some limit on punitive damages, said the award was not so "grossly excessive" that it should be overturned, thus invoking the standard used in *Haslip. Id.* at 462. The Court declined to provide guidance in determining when an award would be "grossly excessive." *Id.* The plurality explained that the dramatic disparity between the actual financial loss and the punitive award was not controlling. *Id.* The award was upheld. *Id.*

34

In 1996, the Supreme Court issued *BMW, supra*, in which the Court first attempted to delineate specific factors that a court should consider in reviewing a jury's award of punitive damages. *See id.* at 575. The Court invoked the concepts of due process to describe the purpose of the review as an assurance of fair notice to the defendant of the consequences of its conduct. *Id.* at 574.

The Court described three factors to be considered. *Id.* at 575. The first was the reprehensibility of the conduct. *Id.* The Court explained that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," and said that an award should reflect "the enormity" of the offense. *Id.* (citations omitted). The second factor was the disparity between the actual or potential harm to the plaintiffs flowing from that conduct, and the punitive damages assessed by the jury. The Court said that the disparity factor was the most commonly cited indicium of an unreasonable or excessive punitive damages award. *Id.* at 580. The Court reasoned this factor is important because it "has a long pedigree" extending back to English statutes from 1275 to 1753 providing for double, treble or quadruple damages. *Id.* at 580–81. Thus, the critical measure is the ratio between the punitive award and the amount of harm inflicted on the plaintiff, or plaintiffs, before the court. The third factor was the difference between the punitive damages and the civil and criminal penalties authorized by the state for that conduct. *Id.* at 583. The Court indicated that reviewing courts should use this factor to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* at 583 (internal quotations omitted).

In *BMW,* the defendant had engaged in a practice of repainting damaged cars and passing them off as never-damaged cars with their original paint. *Id.* at 563–64. The plaintiff who had purchased one of these cars was awarded $4,000 in compensatory damages and $4 million in punitive damages. *Id.* at 565. The Alabama

Supreme Court reduced the punitive damages to $2 million, and the defendant petitioned for certiorari review. *Id.* at 567. The Supreme Court held the punitive damage award was excessive. *Id.* at 585.

In examining the reprehensibility of the conduct, the *BMW* Court found that none of the aggravating factors associated with particularly reprehensible conduct was present, noting that harm inflicted by the defendant was economic and not physical, and that BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others. *Id.* at 576. The Court restricted consideration to the conduct of the defendant towards the plaintiff in the Alabama case and not other conduct that might be a part of a nationwide practice. *Id.* at 572. In looking at the ratio between the punitive damages and the harm, the Court stressed the ratio must be reasonable, thus the ratio must be measured by the ratio of punitive damages to the harm suffered by the plaintiff in that case, without regard to harm that might have been experienced by others and for which the defendant might also be responsible. *Id.* at 580. It concluded a ratio of 500 to 1 was grossly excessive, even breathtaking, but it cautioned against drawing a mathematical bright line that would fit every case, and noted that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 582-83. With respect to the third factor, the relationship between the punitive damages and the comparable penalties under state law, the *BMW* Court stressed that reviewing courts should be mindful of the need to pay due deference to the legislative judgments of states in assessing the reprehensibility of conduct. *Id.* at 583.

In 2001, the constitutional constraints on the amount of exemplary awards were again considered in *Cooper Industries, supra*, wherein the Court ruled that state and federal appellate courts must conduct a *de novo* review of exemplary damage

36

awards challenged as being grossly excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Cooper,* 532 U.S. at 433–434. In mandating a *de novo* review, the Court reasoned that "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a 'fact' 'tried' by the jury." *Id.* at 437.

In 2003, the Court decided *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003). There, the plaintiffs were involved in a head-on collision and sued their automobile insurer, State Farm, for bad faith. *Id.* at 413. The claim was based on State Farm's rejection of an offer to settle the Campbells' claims at the policy limit, State Farm's assurances to them that they had no liability for the accident, State Farm's resulting decision to take the case to court despite the substantial likelihood of an excess judgment, and its subsequent refusal to pay an adverse judgment over three times the policy limits. *Id.* at 413–14. The case was similar to *BMW* in that there were only two plaintiffs before the jury. *Id.* Nevertheless, as in *BMW,* the jury was allowed to consider the effects of similar but unrelated misconduct on many potential plaintiffs who were not before the court. *Id.* at 415. Final judgment after appeal to the Utah Supreme Court was for $1 million in compensatory and $145 million in punitive damages. *Id.* at 412. The Court remanded for the Utah courts to reduce the award. *Id.* at 429.

The Court in *State Farm* once again emphasized that the "most important indicium" of a punitive damages award's reasonableness is the relative reprehensibility of the defendant's conduct. *Id.* at 419; *see also BMW,* 517 U.S. at 575. *State Farm* refined the reprehensibility analysis by instructing courts to weigh five specific considerations: (1) whether the harm caused was physical as opposed to economic; (2) whether the conduct causing the plaintiff's harm showed "indifference to or a reckless disregard of the health or safety of others;" (3) whether

37

the "target of the conduct" was financially vulnerable; (4) whether the defendant's conduct involved repeated actions as opposed to an isolated incident; and (5) whether the harm caused was the result of "intentional malice, trickery, or deceit, or mere accident." 538 U.S. at 419. Although the Court did not rank these factors, it explained that only one factor weighing in a plaintiff's favor may not be sufficient to support a punitive damages award, and the absence of all factors makes any such award "suspect." *Id.*

As to *BMW's* second guidepost, the ratio between harm or potential harm to the plaintiff and the punitive damages award, the *State Farm* Court "decline[d] again to impose a bright line ratio which a punitive damages award cannot exceed." *Id.* at 425. But it provided more guidance than it had in previous cases. First, it indicated ratios in excess of single-digits would raise serious constitutional questions, and that single-digit ratios were "more likely to comport with due process." *Id.* Although the Court stated "there are no rigid benchmarks that a punitive damages award may not surpass," the Court strongly indicated the proportion of punitive damages to harm could generally not exceed a ratio of 9 to 1. *Id.* at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). Second, the Court discussed particular combinations of factors that would justify relatively higher or lower ratios. For example, where a "particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine," ratios in the high single-digits and perhaps even higher might be warranted. *Id.* (quoting *BMW,* 517 U.S. at 582). Conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* Finally, the Court minimized the relevance

of criminal penalties as a guide, saying that they were not particularly helpful in determining fair notice. *Id.* at 428. Indeed, the Court did not analyze State Farm's potential criminal penalty at all, characterizing it as a "remote possibility." *Id.* As to civil penalties, the Court noted only that the $145 million punitive damages award "dwarfed" the $10,000 maximum applicable fine. *Id.*

The *Exxon* case in 2008 involved punitive damages awarded for the *Exxon Valdez* oil spill in Alaska. The district court had determined that actual damages were $507.5 million.[4] The award of $4.5 billion in punitive damages had been reduced to $2.5 billion by the time it reached the Court, which further limited the punitive damages award, settting a "quantified limit" on punitive damages in maritime cases at a 1:1 ratio to compensatory damages. 554 U.S. at 513 n. 27. The Court first recognized that "the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon*, 554 U.S. at 493. The Court expressed lament regarding the "stark unpredictability of punitive awards," and noted that "[c]ourts of law are concerned with fairness as consistency…." *Id.* at 499. To that end, the Court noted its response to "outlier punitive damages awards" had thus far been confined by the claims at the constitutional level and the process standards that every award must pass. 554 U.S. at 501.[5]

---

[4] The district court in *Exxon* had extensively analyzed the relative reprehensibility of Exxon's misconduct and the harm it had caused. *In re Exxon Valdez*, 236 F.Supp.2d 1043 (D. Alaska 2002). Though noting that an accurate assessment of the full extent of the plaintiffs' actual harm was impossible, the district court, according to the appellate court, "had attempted to reconstruct that harm by adding together the jury's compensatory damages verdict of $287 million, judgments in related cases, as well as payments and settlements made to plaintiffs before and during the punitive damages litigation." *In re Exxon Valdez*, 472 F.3d 600, 609 (9th Cir. 2006). Without any comment or analysis of the compensatory damages, the Supreme Court in *Exxon* "[took] for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million." 554 U.S. at 515. Thus, the Court implicitly accepted the premise that the "relevant compensatory damages" could include settlements made to the plaintiffs.

[5] The *Exxon* Court cited *State Farm* and *BMW*, 517 U.S. at 574–575. "Although 'we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula,' *id.*, at 582, 116 S.Ct. 1589, we have determined that 'few awards exceeding a single-

The Court, however, stated: "Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard." 554 U.S. at 501-02. The Court explained that its review of punitive damages "considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy…." 554 U.S. at 502. The Court then considered several approaches and studies before settling on a 1:1 ratio of punitive damages explaining that "given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or measured retribution, we consider that a 1:1 ratio, which is above the median award [of 0.65:1], is a fair upper limit in such maritime cases, [that is, "a case of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury." 554 U.S. at 510-11]. 554 U.S. at 513. In effect, the Court established that, under general maritime law, punishment for conduct minimally related to the goals of punishment and deterrence could be quantifiably limited and subject to a 1:1 ratio with compensatory damages, which in the *Exxon* case were substantial. *See Exxon*, 554 U.S. at 513 n. 27.

With those prefatory guidelines in mind, we turn to the appellate court's analysis of the jury's punitive damages award under the guidelines set forth in *BMW*. The *BMW* Court established three guideposts for determining whether an award is "grossly excessive": (1) the degree of reprehensibility of the misconduct; (2) the

digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process,' *State Farm*, 538 U.S., at 425, 123 S.Ct. 1513; '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee,' *ibid*." 554 U.S. at 501.

ratio, or disparity between the punitive award and the harm, or potential harm, suffered by the plaintiff; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Id.*, 517 U.S. at 575–85.

*Reprehensibility of the Misconduct*

With regard to the degree of reprehensibility, the court of appeal noted the jury had found Teleflex's conduct to be reckless and to demonstrate callous disregard for the safety of its users. The court found such conduct particularly egregious where Teleflex alone had the knowledge in 1989 that its system presented an inherently dangerous condition that became deadly with a few drops of oil loss, and where the cost of avoiding the risk was a thirty-cent label on the system itself. The court also pointed to the testimony of Mr. Fetchko, characterizing it as trivializing Teleflex's duty to warn of a life-threatening risk. The court claimed that Mr. Fetchko admitted that a real warning would cause "mass hysteria" and that Teleflex wanted to dominate the market, which it had been successful in doing. Despite its admission that "there was no actual evidence," and as Teleflex points out, there existed a trial court order prohibiting such evidence, the court of appeal notes that Mr. Fetchko quickly retracted a statement that suggested this was the only incident of its kind. The court of appeal surmises the jury could have discerned from this exchange that there were other deaths. This statement was made after the witness had admitted there were thousands of complaints of hydraulic fluid loss and that this frequency was too small to justify a warning when put in context with the fact that Teleflex had sold millions of the systems. The court reasoned the jury "implicitly found callousness in making frequency the determining factor in placing a simple, inexpensive, but life-saving warning on a product where loss of life was the consequence."

41

The court further found that the aggravating factors for evaluating reprehensibility articulated in *State Farm* were satisfied here, stating:

> [T]he harm here was physical, not economic, and of the worst kind, as it encompassed the violent taking of the life of a promising young man of twenty-two; the evidence before the jury showed tortious conduct evincing indifference and reckless disregard for the safety of others; the target of the conduct may not have been financial vulnerability, but the evidence clearly indicated a vulnerability through inexperience with regard to the users who buy this product. Further, given the thousands of complaints about oil loss, the decision not to warn was made repeatedly; and while the conduct may not equate with trickery, the decision not to warn was intentional for the purpose of avoiding "mass hysteria," which would of course reduce profits. Thus, the profit motive was established.

*Warren*, p. 61-62, 196 So.3d at 813. The court also found the defendant's conduct more reprehensible and more culpable. The court of appeal suggested it could be viewed as concealment and bad faith when Teleflex had knowledge through its own testing that its product was dangerous and yet still withheld that knowledge from those who purchase its product and create the wealth the defendant enjoys. *Id.*, citing *Exxon*.

We found Teleflex's conduct to be negligent for the purpose of finding liability and awarding compensatory damages, and further agreed the evidence supported a finding that its conduct was wanton, reckless, or in callous disregard for the safety of others. We similarly find the evidence weighs in favor of an award of punitive damages; however, we do not necessarily find Teleflex's conduct places it at the extreme end of the reprehensibility spectrum as the court of appeal concludes.

What the evidence shows is that, although Teleflex, from its testing of the system, knew of the serious risks that could result from a small loss of hydraulic fluid, it nonetheless failed to warn its customers, particularly those less experienced, of the possible risk of ejection and severe injury as a result of such a fluid loss. Such conduct is reprehensible, no doubt, as the foreseeable injury here was more than

simply economic, but instead was traumatically and tragically physical. The potential for catastrophic physical harm from a complete loss of steering control while the boat is on plane was certainly known to Teleflex or it should have been known to them. Thus, the first factor in *State Farm*, whether the harm caused was physical as opposed to economic, strongly supports the finding of reprehensibility. Similarly, the evidence supports a finding that Teleflex's tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others. On the other hand, we find no evidence that Teleflex had "targeted its conduct" upon its less-experienced customers because of their financial vulnerability. Whether Teleflex's conduct involved repeated actions or was an isolated incident is a closer call. There is certainly no evidence it had ignored prior serious incidents, and then failed to act. Despite Mr. Fetchko's indirect reference to another death, which Teleflex admits in brief occurred after the incident involving Derek, there was no evidence of a history of prior serious incidents Teleflex had ignored. Notwithstanding, Teleflex certainly possessed knowledge of the risk to its customers, and as reports of the leaks were received, and further testing done, Teleflex either chose not to act or failed to do so despite opportunities.

Lastly, we find little support in the record for the conclusion that the harm caused Derek was the result of intentional malice, trickery, or deceit. Teleflex certainly did not intend to harm Derek or any of its customers. The colloquies between Mr. Fetchko and the plaintiff's counsel do not clearly establish financial and sinister motives for failing to place a warning sticker on the hydraulic system itself, or the intentional and malicious concealment of risk from Teleflex's customers. The reference to Mr. Fetchko's opinion that "over-warning" could result in "mass hysteria" does not in and of itself demonstrate a conscious decision to further a profit motive. While we are not unmindful that circumstantial evidence is

43

the best evidence a plaintiff may be able to muster in such cases, we do not find proof that Teleflex acted maliciously. Accordingly, although we agree that Teleflex's conduct was reprehensible, and certainly within the punishable spectrum, we cannot say the record supports a finding that Teleflex's conduct was on the extreme end of "malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain." *Exxon, supra.*

*The Ratio Between the Punitive Damages and the Compensatory Damages*

We next turn to the court of appeal's review of the ratio of punitive damages awarded as compared to the award of compensatory damages, the objective component of the *BMW* guideposts. The court of appeal found that the ratio of the $23,000,000 punitive damage award as compared to the $125,000 compensatory damage award was 184:1, without considering the potential harm factor of the *BMW* analysis, but is less than 3:1 when potential harm is included. The court noted that Derek's death was violent but mercifully quick, and the jury awarded his father $100,000 for Derek's survival damages. The court noted Derek's mother had settled prior to trial, and thus her loss was not before the jury. The court surmised that the award of $25,000 to the plaintiff reflected the fact that Derek had not been raised by his father. The appellate court described the compensatory awards as unusually low.

With regard to *Exxon*, and Teleflex's argument that *Exxon* limited punitive damages to a 1:1 ratio in maritime cases, the court reasoned that *Exxon* was limited to its facts, especially where the compensatory damages were substantial. *Warren*, pp. 64-66, 196 So.3d at 814-16, citing *Clausen v. Icicle Seafoods, Inc.*, 174 Wash.2d 70, 272 P.3d 827 (2012) (compensatory damages of $37,420, combined with attorney fees of $387,558, resulted in a 3:1 ratio for a punitive damage award of $1,300,000), *cert. denied*, ___U.S. ___, 133 S.Ct. 199, and *McWilliams v. Exxon Mobile Corp.*, 12-1288 (La. App. 3 Cir. 4/3/13), 111 So.3d 564 (compensatory

damages of $5,498,391 and punitive damages of $12,000,000 resulted in a 2.3:1 ratio), *writ denied*, 13-1402 (La. 11/8/13), 125 So.3d 452 (both maritime cases in which the courts concluded the conduct of the defendants was egregious and merited a higher ratio of punitive damages to compensatory damages than a 1:1 ratio).

The court of appeal next determined that under *BMW*'s second factor, it could consider the harm or potential harm suffered by the plaintiff had he lived and suffered amputation or severe disability. The court noted *BMW* had explained that "the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" *BMW*, 517 U.S. at 581 (citing *TXO*, 509 U.S. at 460). To that end, the court cited cases in which the compensatory damages awarded to plaintiffs for traumatic leg amputations ranged from $7,944,200 to $10,800,000. *Warren*, p. 67, 196 So.3d at 817.Using $8,000,000 as representative of compensatory damages for the potential harm the decedent could have suffered, the court calculated a ratio of 2.8:1, a number the appellate court found was within the generalized upper limits of *Exxon* and well below the due process requirements discussed in the Supreme Court's constitutional analysis. The court thus concluded the jury's verdict of $23,000,000 in punitive damages was supported under both the ratio analysis and the reprehensibility analysis.

For potential harm properly to enter into the ratio, it must be directly attributable to the misconduct and not to lawful or unrelated causes. *See Cooper Industries,* 532 U.S. at 441. Teleflex argues that *Exxon* specifically rejected consideration of potential harm in considering the disparity between punitive damages and compensatory damages. Teleflex points to the dissenters in *Exxon*, who would have affirmed the $2.5 billion punitive damages award in that case, rather than impose a 1:1 ratio. However, the majority in *Exxon* did not expressly address

whether potential harm remains a valid consideration in general maritime cases with regard to the 1:1 ratio set in that case, and we decline to try to anticipate how that Court might rule. But actual harm is certainly a relevant consideration, as the history of the *Exxon* case reveals. In that case, the district court, as explained above, considered settlements paid to the plaintiffs during the litigation as relevant compensatory damages under the ratio analysis. In the instant case, the compensatory damages awarded to the father were understandably low, and there is no suggestion the jury abused its discretion with regard to those awards. *See Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1261 (La.1993). The mother of Derek settled her claims prior to trial, thus the compensatory damages she received could logically be added to the denominator in the ratio analysis as included in the actual harm caused by the defendant's conduct. In *Hutto v. McNeil-PPC, Inc.*, 2011-609 (La. App. 3 Cir. 12/7/11), 79 So.3d 1199, *writ denied*, 86 So.3d 628 (La. 4/27/12), the court of appeal recently affirmed general damages in the amount of $2,000,000 to each parent for the death of their child in a products liability case. Thus, using that amount, relevant compensatory damages in this case could reasonably total $2,125,000, which when compared to the punitive damages awarded by the jury, would result in a ratio of 10.8:1, beyond the single digit limits of constitutional due process as well as the upper limits in *Exxon*.

*The Amount of Civil or Criminal Penalties*

We next turn to the third factor under *BMW*, comparing the punitive damages award to the civil or criminal penalties that could be imposed for comparable conduct. *BMW*, 517 U.S. at 559. But like the court of appeal, we can discover no codal authority that would impose monetary civil or criminal penalties for the conduct of Teleflex in this case. The court of appeal cited at least one case interpreting this guidepost as now calling for a comparison with other punitive

46

damage awards in order to satisfy the requirement that the tortfeasor receive "fair notice" that his wrongful conduct could entail a substantial punitive damage award when penalties for comparable conduct are low. *Warren*, 196 So.3d at 817. However, we find no support for such a comparison in the Supreme Court's constitutional due process analysis or its recent decision in *Exxon*.

*The Wealth of the Defendant*

We last turn to the factor recognized in *Mosing* that the wealth of the defendant may be considered in determining an amount that would deter future commission of the same actions and misconduct. *Mosing*, 830 So.2d at 967. Here, Mr. Fetchko confirmed that Teleflex's worth in 2013 was over $4 billion, and that the punitive damage award of $23,000,000 represented only 1/174 of the company's net worth.

*Conclusions as to Due Process Violation and Exxon*

The defendant argues the evidence in this case does not support a finding that its conduct was motivated by profit, and thus was an enhancing factor. There is no evidence here, Teleflex contends, that it made a conscious mercenary decision to put profits ahead of safety. Mr. Fetchko's use of the word "hysteria" was wrongly interpreted by the court of appeal to establish that the decision not to warn was somehow intentional for the purpose of avoiding "mass hysteria," which would result in lower profits.

The evidence in the record shows that, although Teleflex, from its testing of the system, knew of the serious risks that could result from a small loss of hydraulic fluid, it nonetheless failed to warn its customers, particularly those less experienced, of the possible risk of ejection, severe injury, and death as a result of such a fluid loss. We agree with the court of appeal that such conduct is reprehensible and that it resulted in great harm to Derek and his family. But we agree with the defendant that

47

the plaintiff failed to prove that Teleflex acted maliciously or that its behavior was driven primarily by desire for gain. The compensatory damages actually awarded to the plaintiff were low, but the harm caused was great, and thus the door was opened to higher awards. *Exxon*, 554 U.S. at 513. Nevertheless, we find that the award of punitive damages in the amount of $23,000,000 was higher than reasonably required to satisfy the objective of punitive damages awards: punishment, general deterrence, and specific deterrence. *Mosing*, 830 So.2d at 978. Because there was no showing that Teleflex's conduct was malicious or profit-driven, such that it needed to be severely punished, the amount of exemplary damages awarded by the jury simply does not further the goals of punitive damages. There is no doubt that the defendant is a wealthy corporation, but wealth should not be a driving factor behind a punitive damage award in the absence of a showing that the defendant's conduct was motivated by malice or greed. As such, based on the application of the factors set forth by the *BMW* and *Mosing* courts, we conclude that the $23,000,000 violated the defendant's due process rights.

Continuing with our review, we will now determine and assess a constitutionally appropriate exemplary damage award in this case. The court in *BMW* refused to set a "mathematical bright line" for grossly excessive punitive damage awards, and noted that a low compensatory damage award "may properly support a higher ratio than high compensatory awards, if for example, a particularly egregious act has resulted in only a small amount of economic damages." *BMW*, 517 U.S. at 582-83. In this case, the harm caused was great-- physical injury resulting in the violent death of a young man--while the defendant's conduct was not the most egregious on the spectrum of punishable cases, and the compensatory damages actually awarded were relatively small. In our view, based on the actual harm, and the relevant compensatory damages as outlined in the *Exxon* line of cases, we find

48

that a punitive damage award of $4,250,000, with a ratio of 2:1 to relevant compensatory damages of $2,125,000, more appropriately furthers the goal of punitive damages, that is, to punish and to deter future conduct, while protecting the defendant's right to due process. Accordingly, we amend the jury's award of punitive damages to $4,250,000, and affirm as amended.

**CONCLUSION**

After reviewing the record and the applicable law in this case, we find no reversible error in the trial court's rulings; however, we do find the award of punitive damages was excessive and resulted in a violation of the defendant's right to constitutional due process. For the reasons expressed above, we affirm the lower court's judgment in part, amend the judgment to award $4,250,000 in punitive damages to the plaintiff, and affirm as amended.

# SUPREME COURT OF LOUISIANA

## NO. 2016-C-1647

## RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEREK HEBERT

## VERSUS

## SHELTER MUTUAL INSURANCE COMPANY, ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,*
*THIRD CIRCUIT, PARISH OF CALCASIEU*

**WEIMER, J.**, dissenting.

I respectfully dissent, finding that a new trial was improperly granted, and that the jury's verdict finding the defendant, Teleflex, was not liable should be reinstated. In that regard, I agree with the much-detailed analysis of my learned colleague on the appellate panel, Judge Conery, as highlighted below.[1]  See **Warren v. Shelter Mutual Ins. Co.**, 15-0354 (La.App. 3 Cir. 6/29/16), 196 So.3d 776, 821 (Conery, J., dissenting).

In this case regarding liability for a boating accident, the plaintiff failed to object to the trial judge's direction to the jury when providing a boat owner's manual during jury deliberations.[2]  Although the judge erroneously suggested that the manual was produced contemporaneously with the boat's manufacture, the judge's direction was given after consulting with counsel for both parties.  Then, after directing the jury, the judge even asked if there was any objection, but again, the plaintiff lodged no objection.  The plaintiff should not have been granted a new trial when the

---

[1]  While I agree with the majority opinion that the amount of punitive damages awarded is excessive, I do not specifically reach that issue as a result of my dissent.

[2]  The manual at issue was introduced into evidence on behalf of the plaintiff.

plaintiff failed to put the court on notice of any perceived problem regarding the direction to the jury. The plaintiff's failure to object deprived the court of the opportunity to cure any problem. Granting the plaintiff a new trial under these circumstances essentially approved of the impermissible tactic of allowing the plaintiff to await the jury's verdict and to negate the jury's verdict if the plaintiff did not like some aspect of the verdict.

Once the jury rendered its verdict, the plaintiff had the burden to prove that a new trial was warranted as a result of a miscarriage of justice. This court has previously recognized that a jury's verdict must stand when it is "supportable by a fair interpretation of the evidence." **Davis v. Wal-Mart Stores, Inc.**, 00-445, p. 12 (La. 11/28/00), 774 So.2d 84, 95. Here, the plaintiff's case against Teleflex was premised on the failure to post a warning sticker on the boat or to provide an audible alarm for low hydraulic fluid. The plaintiff's theory of the case was consistent with the plaintiff's own expert, who agreed that the manual was "immaterial" because the boat did not come with a manual.[3] The judge's direction about the manual could not, therefore, have amounted to a miscarriage of justice. See **Bloxom v. Bloxom**, 512 So.2d 839, 850-51 (La. 1987) (finding that "even if an adequate warning of the particular danger in this case had been given by a proper provision in the manual, such a warning would have been futile because [the owner] did not read the manual before parking his car over combustible materials.").[4] From all that appears, what happened instead of a miscarriage of justice is that the jury simply and legitimately

_____

[3] As the majority of this court recognizes, the boat owner purchased the boat pre-owned and testified that no manual was provided. See **Warren v. Shelter Mutual Ins. Co.**, 16-1647, slip op. at 9 (La. 10/18/17).

[4] As described in **Payne v. Gardner**, 10-2627, p. 3 (La. 2/18/11), 56 So.3d 229, 231, **Bloxom** was decided before the current Louisiana Products Liability Act and under a standard of "normal use," which was even broader than the liability standard under current law.

2

rejected the plaintiff's theory that if Teleflex had posted a warning sticker or installed an audible alarm, such measures would have prevented the accident.

There was additional evidence submitted to the jury on the question of what might have prevented the accident. Although the boat owner's son initially denied to investigators that he had worked on the Teleflex hydraulic system, he ultimately admitted that he used vise grip pliers to try to stop hydraulic fluid from leaking. Additionally, the boat owner testified that a few months before the accident the steering "felt different" so he added hydraulic fluid. Teleflex presented an expert who demonstrated to the jury the effects of a hydraulic leak. As the expert indicated, if the fluid leaked, air would enter the system and would cause pronounced "clicking." The vessel operator would encounter a "bumpy" or "mushy" feeling and, as time went on, it would take more turns of the steering wheel to operate the boat. From Teleflex's presentation, it was fair for the jury to conclude–consistent with this court's **Davis** ruling–that a reasonably prudent operator would have noticed tangible warnings of steering problems before the type of failure that occurred here. Moreover, it was fair for the jury to conclude that a reasonably prudent operator would not have operated the boat after noticing such warning signs, but would have instead had the steering system inspected and repaired.

In sum, just as Judge Conery identified, there was considerable evidence to support the jury's finding "that Teleflex was not liable for failure to post visible warnings." See **Warren**, 15-0354 at 23, 196 So.3d at 833 (Conery, J., dissenting). Thus, I respectfully dissent from this court's majority, which upholds the granting of a new trial, and would reinstate the verdict of the first jury.

3

SUPREME COURT OF LOUISIANA

No. 2016-C-1647

RON WARREN, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF DEREK HEBERT

VERSUS

SHELTER MUTUAL INSURANCE COMPANY, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU

**CLARK, J.,** dissenting.

With respect, I dissent from the majority opinion. For the reasons that follow, I find the trial judge improperly granted a new trial and that such error necessitates a reversal of the court of appeal judgment and the reinstatement of the first jury verdict.

The trial judge granted a new trial under the discretionary grounds of La. Code Civ. P. art. 1973. However, this discretion is not unlimited; rather, after a careful review of the facts and circumstances, the trial court can only grant a new trial when the judgment would result in a "miscarriage of justice." *Lamb v. Lamb*, 430 So.2d 51 (La. 1983). Instead of adhering to the jurisprudential instruction that a trial record must be carefully examined to determine whether the jury verdict was or was not supportable by any fair interpretation the evidence, the trial judge herein stops short of any analysis of the evidence. Rather, he cites only to his own misstatement to the jury. However, no materiality of the mistake was shown. As argued by Teleflex, neither of the owner's manuals were relevant because the owner admitted he never received a manual when he bought the boat. Not only does *Bloxom v. Bloxom*, 512 So.2d 839 (La. 1987) militate against the reliance on warnings in a user's manual

1

under these circumstances, the plaintiff himself did not rely on the manual as part of his theory of liability. The sole issue was the lack of a visible warning on the boat itself. Thus, any wrong statement concerning the date of the manual considered by the jury simply did not matter and certainly could not qualify as a miscarriage of justice. Without a legally sufficient reason to conclude that a miscarriage of justice occurred, the majority erred in concluding there was no abuse of discretion in this regard. The trial judge's regret, alone, is insufficient to justify a grant of a new trial.

Moreover, the plaintiff did not object to the misstatement made by the trial judge despite knowing the statement was made. The plaintiff should not be allowed to use a statement, of which he was aware at the time of its making and to which he did not contemporaneously object, at a later procedural stage when he is armed with the benefit of the knowledge of the trial's outcome, which notably, was not in his favor. This gives the litigant a second bite at the apple, which is strictly forbidden. See *State v. Thomas*, 427 So.2d 428 (acknowledging the existence of and the rationales behind the contemporaneous objection rule).

Last, as carefully articulated by Judge Conery, the trial judge was tasked with examining the entire record to determine if a fair view of the evidence could reasonably support the jury's verdict. Aside from leaning on the regret of his own role in the inaccurate comment made to the jury, the trial judge does nothing to ascertain whether the verdict was supportable by record evidence. He certainly did not "carefully examine" the trial record as contemplated in *Campbell v. Tork, Inc.* 03-1341 (La. 2/2/0/04), 870 So.2d 968. Had he done so, it would have been impossible to upset the jury's verdict in light of the following: the original hose had been replaced with a non-Teleflex hose and this replacement hose was the leaking part; the boat owner's son used his own tools to stop the fluid from leaking, proving

2

that he had knowledge of the leak; the boat owner, who was an experienced boat operator, acknowledged that the steering was different than usual, causing him to add fluid; signs were present alerting the operator that the steering was compromised ("clicking" sounds and a "mushy/bumpy" feeling); and the steering system had been in use by Teleflex for fifteen years without complaints of complete steering failure. This evidence surely supports the jury's verdict that found Telefax not liable. The judgment was reasonable and based on credibility determinations and fault assessments that cannot be overturned due solely to remorse over a statement that never should have been made. (See La. Code Civ. P. art. 1791, the trial judge is prohibited from commenting on the evidence in the jury's presence.) Accordingly, I find the trial court abused its discretion in granting the new trial and I would reverse and reinstate the jury verdict.

**SUPREME COURT OF LOUISIANA**

**No. 2016-C-1647**

**RON WARREN, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF DEREK HEBERT**

**VERSUS**

**SHELTER MUTUAL INSURANCE COMPANY, ET AL.**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU**

**CRICHTON, J., dissents and assigns reasons:**

For the reasons assigned by Justice Clark, *Warren v. Shelter Mut. Ins. Co.*, 2016-1647, slip op. (La. __/__/17) (Clark, J., dissenting), I dissent from the majority opinion.[1]

---

[1] Because I would find the trial court abused its discretion in granting the new trial, the remaining issues addressed by the majority opinion would be pretermitted. Nevertheless, I agree with the majority opinion's assertion that the legislature may find it worth considering whether bifurcation of liability and punitive damages proceedings should be mandatory.